# EXHIBIT A

### <u>INDEPENDENT CONSULTING AGREEMENT</u>

This Independent Consulting Agreement ("Agreement") is between Flavors, LLC (dba Flavors), a Maryland Limited Liability Company with offices at <u>6504 America Boulevard, Suite 105A, Hyattsville, MD  20782</u> (referred to as "Company") and Homegrown By Chef Janelle,

*



| an LLC ▼ |
| --- |

with offices located at 30 Wall Street, 8th Floor

New York, NY 10005

(referred to as "Consultant"). They shall be referred to individually as "Party" or collectively as the "Parties." This Agreement is effective upon the date of the last affixed signature ("Effective Date").

## ARTICLE I. DEFINITIONS.

–

In addition to the terms defined elsewhere in this Agreement, the following terms when capitalized shall have the meanings as set forth below:

**A. Agreement**  refers to this Consulting Agreement only when capitalized.

**B. Company Contract** refers to the contract between the Company and the Grant Provider/Federal Government providing the monies for the Program.

**C. Subject Matter Expert** is the Consultant who is being hired as a subject matter expert to produce and develop exclusive content and materials for the Company and Company's Program.

**D. Grant Provider** refers to the federal government agency managing oversight and distribution of Program funding.

**E. Program** is defined as the Company's virtual training program(s) cultivated for their community of culinary students.

**F. Successfully Performed** is defined as Consultant's adherence to all contract terms and conditions, program goals and objectives, timeliness of meeting milestones, and quality deliverables under this Agreement.

**G. Technical Direction** refers to guidance, feedback, and instruction provided by the Company on the syllabus, outline, and materials to ensure that content and material development and instruction meet the expectations and overall learning objectives and goals of the Program as well as the key metrics of the Grant Provider.

**H. Technical Lead** is the hired instructor and Subject Matter Expert responsible for development and delivery of the Program content and materials. The technical lead is the point of contact for all communications for this Agreement, unless stated otherwise in writing.

## ARTICLE II. BACKGROUND.

**A.**  Company has been awarded a federal grant to develop an innovative and exclusive virtual training program(s) ("**Program**");

**B.**  Company issued a Request for Proposals to recruit Subject Matter Experts to participate in the Program;

**C.**  Consultant submitted a proposal in response to Company's Request for Proposals for Consultant to develop and/or provide educational curriculum and content based on their area of expertise, and to teach said curriculum at the designated teaching times to Program participants;

**D.** Company is satisfied that the Consultant has the necessary skill, expertise, and knowledge to be a Subject Matter Expert and has approved Consultant's Proposal; and

**E.** Company and Consultant desire to enter into this Agreement to perform the services set forth in Consultant's Proposal and as required by the Company according to the terms of this Agreement.

**The Parties hereby agree to be legally bound according to the following terms and conditions:**

## ARTICLE III. SCOPE OF SERVICES.

**A.** The scope of work described in Schedule A (the "**Services**") will be successfully performed by the Consultant. Consultant must meet all performance requirements in Schedule A, if any, for deliverables to be deemed acceptable by the Company. Consultant agrees to adhere to the Company's requirements for performance of Services, including but not limited to, complying with delivery and performance deadlines in order to assist the Company with adhering to the terms of the federal grant funding the Program. Consultant shall perform their duties as a Subject Matter Expert in a professional manner and in compliance with all terms and conditions provided in this Agreement.

**B.** Consultant designates

*

> Culinary Expert and Chef

as Consultant's Technical Lead/Subject Matter Expert and as the Company's contact point responsible for managing the performance of the Services by Consultant and for coordinating performance with Company.

**C.** The Company has set guidelines for the Program and the Consultant agrees to submit a curriculum outline and/or proposed syllabus to the Company for pre-approval prior to the creation of any Program materials. The Company, in its sole discretion, reserves the right to accept the curriculum outline and/or proposed syllabus or provide Technical Direction to ensure the Consultant's curriculum aligns with the Program goals, vision, and expected outcomes. Once approved, the Consultant is free to create and deliver content freely within the Program guidelines according to the approved curriculum.

1. To be valid, Technical Direction: must be consistent with the general scope of work set-forth in Schedule A; shall not change the expressed terms, conditions, or specifications incorporated into this Agreement; and shall not constitute a basis for extension to the Agreement's delivery schedule or increase in the Agreement fee; and must be provided to Consultant's Technical Lead, when possible, or directly to the Consultant. Any dispute over or reasonable belief that the Technical Direction to the Consultant exceeds the limitations in this Paragraph shall be communicated to the Company as outlined in Subsection C.2. below.
2. If Consultant believes any direction exceeds these limitations, Consultant shall notify Company in writing within ten (10) days of receipt of such Technical Direction. Consultant        shall be obligated to continue with performance as directed, notwithstanding any dispute as to whether the   Technical Direction exceeds the limitation stated above.

**D.** Company shall review the deliverables and/or provide input to Consultant for performance related queries.

**E.** Notwithstanding any other provisions of this Agreement or any document referenced herein, the Company's Founder & CEO, Samia Bingham, is the only individual authorized to make changes in the scope or nature of the work required by this Agreement. In the event Consultant implements any change at the direction of any other person, the change   will be considered as having been made without authority and an adjustment will not be made in the Agreement fee or delivery schedule as a result thereof.

This Agreement shall be effective beginning on the **Effective Date** until the Agreement is terminated according to Article X: TERMINATION, or on the date of termination of the Company's contract with the federal government Grant Provider (referred to as "**Company Contract**").

The Company reserves the right to amend the term of this Agreement by providing Consultant notice of the term change without the consent of the Consultant. Consultant understands and agrees that the change in the term for performance of this Agreement could include a reduction and/or increase in the hours, price, or personnel requirements, as well as any other changes made by the Company. Amendment of the term and accompanying modifications under this Article shall not constitute a breach of this Agreement.

## ARTICLE V. COMPENSATION.

Consultant shall be compensated for Services at a fixed rate as set forth in Schedule B & C to be paid in installments to begin Service, upon successful delivery of Service deliverables, and complete Service. Payment for Services shall not exceed the total amount specified. Travel costs are not included. However, if required, travel will only be authorized if approved by the Company in writing. Before payment can be made, Consultant must submit invoices to the Company for Services performed. Invoices shall include copies of any and all receipts. Unless otherwise specified, the total invoice is all inclusive and no other monies will be paid to Consultant for compensation or reimbursement of other direct expenses.

Consultant shall adhere to the payment instructions and payment schedule outlined in Schedule B and the instructions for submission of invoices in this Section. Consultant is specifically cautioned that incorrect or incomplete invoices will delay payment.

Upon receipt of a satisfactory invoice and documentation, Company shall take all reasonable efforts to pay the invoice electronically within thirty (30) business days after receipt of payment from the Grant Provider for such Services, provided that any withholding, retainer or holdback imposed on such payment to the Company for Consultant-provided Services shall in turn be imposed on Consultant by Company. The Consultant releases Company from all claims connected to payment for Services less than the amount invoiced for under this Section as a result of actions taken by the Grant Provider (federal government).

## ARTICLE VI. CONFIDENTIAL INFORMATION.

**A.**  The Parties may provide to one another information that is confidential ("**Confidential Information**"). Confidential Information shall be Limited to information clearly identified as confidential or proprietary and information as defined below.

"Confidential Information" shall mean any and all information which is possessed or developed by or for a Party and which relates to the Party's existing or potential business or technology, which information is generally not known to the public and includes, without limitation, the following: intellectual property and proprietary rights, including proprietary inventions and technology, patentable ideas, product and service developments, compositions, formulas, technical developments, technical and engineering data, research or test data and results, existing or proposed research and development, and information concerning the development or protection of any related copyrights, patents, or trade secrets, source code and software; business operations, including business plans, business strategies, business know-how and techniques, records, results of operations, pricing, employee or contractor compensation, grant strategies, grant financials, existing or potential grant contracts or applications, communications between a Party's employees and attorneys representing a Party, business projections, and terms of a Party's contracts; product or service information, including all related data, specifications, costs, pricing, plans, ideas, methods,

and research, sales and marketing information, including existing or proposed clients, strategic marketing plans or forecasts, leads, partners, licensees, sales or marketing techniques or strategies, negotiation strategies, information generated for customer or client engagement, and costs; financial and accounting information, including information related to a Party's financial condition, revenue, liabilities, expenses, financial projections, investments, financial statements, reports, accounts receivables, and inventory; and information received by a Disclosing Party from others that the Disclosing Party has an obligation to treat confidential.

**B.** Confidential Information shall not include information which: (i) is or becomes part of the public domain through no act or omission of a Party; (ii) was in a Party's lawful possession prior to the disclosure and had not been obtained either directly or indirectly from the other Party; (iii) is lawfully disclosed to a Party by a third-party without restriction on disclosure; (iv) is independently developed by a Party; or (v) is disclosed by operation of law. In addition, a Party shall be entitled to disclose Confidential Information to the extent required  by law or judicial order, provided that prior written notice of such required disclosure is furnished to the Party which owns the Confidential Information subject to disclosure within five (5) days or as soon as practicable in order to afford the said Party an opportunity to seek a protective order.

**C.** While the Services are being performed and for a period of six (6) years after completion of Services or termination of this Agreement, whichever is the latter date, each Party shall hold all Confidential Information in confidence and have a duty to prevent disclosure of Confidential Information, except as required to be disclosed to fulfill the obligations of the Company Contract or by law or judicial order, and shall treat such Confidential Information with the same degree of care that it uses to protect its own confidential information, which shall be no less than a reasonable degree of care. Consultant shall use Company's Confidential Information solely for the purpose of providing the Services.

**D.** Upon request to do so or within ninety (90) days after the completion of Services and delivery of all files to the Company, the Consultant shall remove all Company Confidential Information and Company Intellectual Property as identified in Article XVII: INTELLECTUAL PROPERTY from its devices, hard drives, cloud backups, and possession, and any other place the information has been stored. Any hard copy notes shall be shredded and discarded in the proper manner after they are delivered to the Company. Both Parties shall take reasonable measures to ensure the safe delivery of Confidential Information and/or Property belonging to the other Party is returned prior to the destruction of said material. Any request to confirm removal of Confidential Information and Property under this Article shall be in writing and confirmation shall be provided within thirty (30) days of receipt of the request.


# ARTICLE VII. RELATIONSHIP OF THE PARTIES.

The Parties expressly agree that the relationship between the Parties shall be that of independent contractors and the relationship between them shall not be considered a partnership, joint venture, employer-employee, or principal-agent relationship. Neither Party shall have the power or authority to obligate, make any statements, representations, commitments of any kind, or to take any action, which shall be binding on the other Party, without the prior written consent of that Party. Consultant's employees will not be considered employees of Company within the meaning or the applications of any federal, state or local laws or regulations, including but not limited to, laws or regulations covering unemployment insurance, old age benefits, worker's compensation, industrial accident,   labor, taxes of any kind, or fringe benefit programs for the purpose of vacations, holidays, pension, group life insurance, accidental death, medical, hospitalization, and/or surgical benefits. Consultant's personnel who perform any part of the Services shall be under the employment, and ultimate control, management, and supervision of Consultant. Consultant shall have the sole responsibility for paying all such taxes and other amounts due under applicable laws and regulations, and all amounts due for fringe benefits, in respect to Consultant's employees. Consultant shall release, indemnify, defend, and hold Company harmless from any claims or liabilities, including attorney's fees and costs of litigation to the extent caused by or in connection to a breach of the above responsibilities in this Article by Consultant.

If for any reason a situation arises in which Consultant is communicating with the Company's Grant Provider (including their representatives), whether or not related to the Services being performed under this Agreement, Consultant shall not propose, solicit, approach, or otherwise   encourage Grant Provider to select Consultant for competing opportunities/placements and/or to place opportunities/placements directly with Consultant if such opportunities/placements fall within the scope of Company's Contract with the Grant Provider. Consultant shall inform the Company's CEO & Founder, Samia Bingham, promptly in the event of the occurrence of the above communications and if the Grant Provider approaches Consultant with an interest or intent of competing opportunities/placements or working directly with the Consultant to place or create opportunities/placements, regardless if such opportunities/placements are competing opportunities/placements.

## ARTICLE IX. STOP WORK ORDER.

- The Company may at any time be required to stop work due to any number of reasons that include a direct order to do so from Company's Grant Provider. In the event that Company issues a stop work order, it shall be in writing to Consultant, and require Consultant to stop all or any part of the work called for by this Agreement for a period not to exceed ninety (90) consecutive days after such order is delivered to Consultant, and for any further period to which the Parties may agree. Such order shall be specifically identified as a stop work order issued under this Article. Upon receipt of the order, Consultant shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of ninety (90) consecutive days after a stop work order is delivered to Consultant, or within any extension of that period to which the Parties have agreed, Company shall either: (i) cancel the stop work order; or (ii) terminate the work covered by the order, as provided in Article X: TERMINATION of this Agreement. For purposes of calculating the ninety (90) days, the day and time of issuance of the stop work order and the proceeding twenty-four (24) hours shall count as one (1) day.

- If a stop work order issued under this Article is canceled or the period of the order or any extension expires, Consultant shall resume work. Company shall make an equitable adjustment in the Agreement delivery schedule or fee, or both, and the Agreement shall be modified, in writing, without the Consultant's consent, if: (i) the stop work order results in an increase in the time required for the performance of any part of   this Agreement; (ii) the stop order results in travel costs associated with the return of an employee on authorized travel who is essential and irreplaceable for the performance of any part of   this Agreement; and (iii) Consultant asserts its right to the adjustment within thirty (30) days after the end of the period of work stoppage, provided that, if Company decides the facts justify the Consultant's request Company may, in its sole discretion, receive and act upon the claim submitted at any time before final payment under this Agreement.

## ARTICLE X. TERMINATION.

## A. Termination for Convenience.

1. Company may terminate this Agreement, in whole or part, for any reason at any time.
2. Consultant may terminate this Agreement, for any reason, within thirty (30) days of executing this Agreement contingent upon such termination is made prior to the performance of any Services and receipt of any deposit or payment for Services.
3. In the following circumstances, Company shall consider this Agreement automatically terminated by the Consultant, unless the Consultant submits a written statement within ten (10) days of any event listed below clearly stating their

capabilities to perform contracted services and identify a plan of action to hire consultants or qualified personnel that will be assigned to particular tasks, that is satisfactory to and accepted by the Company:

- If at any time during the term of this Agreement, the Subject Matter Expert is officially declared incompetent or insane, becomes incapacitated or mentally impaired to the point that Consultant is incapable of performing its duties under this Agreement in the Company's sole judgment, is arrested for more than ten (10) days, or declared dead (collectively, the "**Event**"), then Consultant's and Subject Matter Expert's business partners, employees, legal spouse, successors in interest, estate executor, trustee, and representative shall all have a duty to notify the Company immediately upon the occurrence of any Event listed in this Subsection and no later than five (5) business days from the date of a terminating Event. Consultant's obligations to the Company do not cease upon the occurrence of an Event in this Subsection, including death. Therefore, any work performed and accompanying notes up until the Event is Company property and must be delivered to the Company within thirty (30) days; any deposit or monies for Services not performed prior to the Event must be returned within thirty (30) days to the Company in full; and the Company reserves the right to demand reimbursement plus interest for any costs incurred, including attorney and legal fees, to retrieve unearned monies after the thirty (30) days and perform the Services or find a suitable replacement for the Consultant. During the term of this Agreement, Consultant shall be responsible for leaving in plain sight a note of who to contact (the Company) and the deadline in the case of the occurrence an Event as listed above to comply with the terms of this Subsection.

4. The Terminating Party will provide written notification to the other Party identifying the reason for termination at least ten (10) days before the termination date, except where stated otherwise.

- If Company has submitted payment electronically or Consultant receives payment within the ten (10) day period, both Parties shall take all reasonable measures to stop the transfer, reverse the transfer, or Consultant shall promptly return the full payment amount to Company without subtracting any transfer or transactions fees by no later than five (5) business days from the day of receipt, or as soon as reasonably possible under the circumstances.

5. Upon receiving Company's notice of termination, Consultant will immediately cease all work being performed under the affected scope of work issued, unless instructed otherwise by Company, and submit all work to the Company. The Company will only be liable for amounts due up to the date of termination in accordance with the provisions of this Agreement.

## B. Termination for Cause.

1. The Company may terminate this Agreement for cause, in whole or in part, at any time for the following reasons:

- **Failure to Cure:** If Consultant breaches, violates, or defaults on any of the terms of this Agreement and fails to cure the breach within five (5) business days of written notice, Company may immediately terminate this Agreement;
- **Performance**: Consultant and/or any of their personnel provides un acceptable and/or untimely Services to Company or Services of less than high quality;
- **Deliverables**: Consultant submits poor quality, unacceptable or untimely deliverables to the Company;
- **Communication**: Consultant contacts or initiates communications with the Grant Provider regarding Services covered under this Agreement without advance written approval from the Company;
- **Unauthorized Assignment:** Consultant engages another Company, business, or individual that has not been approved by the Company to provide Services, in whole or part, or develop any portion of the Intellectual Property that prevents absolute transfer, assignment, and ownership of the Intellectual Property to or by Company;
- **Key Personnel**: Consultant changes key personnel or other personnel ("**Personnel**") without prior written approval from Company. Company is not granted the ability to approve or request removal of any Personnel per

Case 1:25-cv-00029-ECC-TWD    Document 6-2    Filed 08/26/25    Page 9 of 25

- **Reporting**: Consultant fails to submit acceptable and timely monthly reports to Company on or before the last day of each month, which shall meet Company expectation with details of all tasks and activities completed within that month; and
- **Security**: Consultant and/or any of their Personnel fail to meet Company security requirements and/or breaches any security regulation or policy of Company as outlined in Schedule A and F, and Exhibit A.


2. By written notice to Consultant, Company may immediately terminate for cause all or any portion of the Services covered by this Agreement in any of the following circumstances:

- If, after ten (10) days following notification by Company, Consultant fails to fulfill its obligations, or fails to make progress as to endanger performance of Services under this Agreement in the sole judgment of Company;
- If Consultant is adjudged insolvent or bankrupt, or upon the institution of any            proceedings by or against Consultant seeking relief, reorganization, or arrangement under any laws relating to insolvency, or upon any assignment for the benefit of creditors, or upon the appointment of a receiver, liquidator or trustee of any of Consultant's property or assets, or upon liquidation, dissolution or winding up of Consultant's business; or
- If Consultant commits any act which constitutes a default on the part of the   Company under its Company Contract, which may include but is not limited to the following: poor quality work product; delivery of unapproved work/Services; delivery of subpar Services; unprofessional conduct and communications; missed deadlines; disclosure of any intellectual property created or used during the performance of Services; disclosure of Company's Confidential Information or intellectual property; intellectual property fraud, theft, misappropriation, or infringement; and poor and deceptive business practices such as lying, embezzlement, fraud, theft, or falsifying invoices, reports, information or any documentation submitted or provided to Company under this Agreement.


3. Consultant may terminate for cause if the Company breaches, violates, or defaults on any of the terms of this Agreement and     fails to cure the breach within twenty (20) business days of written notice. Consultant may terminate this Agreement, unless such breach, violation, or default is not the fault of the Company, but the Grant Provider.


# C. Effects of Termination

1. In the event of such termination for cause, and with respect to the Services so terminated, Consultant shall be entitled to compensation in accordance with Article III: SCOPE OF SERVICES for Services actually and satisfactorily performed prior to the effective date of termination, and for which Company receives compensation from the Grant Provider. Consultant shall reimburse the Company, without delay, any monies paid to Consultant that are deemed unearned for any reason as outlined under this Agreement. Such payment shall be reimbursed in the full amount without subtraction of any bank, transfer or transaction fees.
2. In the event Company terminates all or any portion of the Services for cause, Company may procure, upon such terms and in such manner as it may deem appropriate, Services similar   to those terminated, and Consultant shall be liable to Company for any excess costs for such similar   Services, provided, however, that Consultant shall continue performance of the Services to the extent not terminated.
3. Upon receipt of any termination notice, Consultant shall immediately discontinue performance with respect to the terminated portion of the Services, except as necessary to protect and to preserve data and materials in the possession or control of Consultant in which Company and/or Consultant has an interest.
4. Upon any termination or expiration of this Agreement or with respect to any   Services, Consultant shall deliver to Company all Consultant work product in process and completed, all drafts, and other materials developed in connection with the terminated Services as well as all intellectual property licensed and shall perform such other acts to the extent requested, that would be required of Company under the Company Contract in connection with a corresponding termination or expiration of Services and/or the Company Contract.

## ARTICLE XI. DELAYS.

### A. Consultant Delays.

1. In the event that Consultant expects that one of its obligations under this Agreement cannot be performed in a timely fashion or in accordance with any performance schedule set forth in Schedule A, Consultant shall provide written notice to Company immediately. Notice shall include all information known to Consultant relating to such delay and the date upon which Consultant expects to complete performance. Such notice shall in no way constitute an excuse of non-performance or a waiver by Company. In the event Company has reason to believe that Consultant may be unable to successfully or timely perform any of the Services, Company may request that Consultant provide Company with adequate assurance that Consultant will properly perform such obligations. If Consultant is unable or fails to provide such assurance within a reasonable time, then Company may perform the Services in lieu of the Consultant and deduct the cost of Company's substitute performance from the amount that would otherwise be payable to Consultant.

### B. Company Delays.

1. If the performance of all or any part of the Services under this Agreement is delayed or interrupted (i) by an act of Company in the administration of this Agreement that is not authorized by this Agreement, whether implied or expressed, or (ii) by a failure of Company to act within the time specified in this Agreement, or within a reasonable time if not specified, then:
   - an adjustment shall be made in the performance schedule and any other contractual term or condition affected by the delay or interruption, and the Agreement shall be modified, in writing, accordingly without written consent of the Consultant; HOWEVER,
   - no adjustment shall be made under Section B of this Article for any delay or interruption to the extent that performance would have been delayed or interrupted by any other cause, including the fault or negligence of Consultant, or for which an adjustment is provided or excluded under any other term or condition of this Agreement.

2. A claim under this Article shall not be allowed for any costs incurred more than twenty (20) days before Consultant notifies Company in writing of the act or failure to act involved. Any claim under this Article shall be prohibited if the amount of costs incurred is not clearly stated along with the assertion of facts and supporting evidence of the alleged act or failure to act by Company,   which must be in writing and delivered within twenty (20) days after the termination of the delay or interruption, or as soon as practicable if circumstances under this Agreement frustrate Consultant's ability to send notice of the claim within the prescribed time frame.

### C. Force Majeure: Excusable Delays of Either Party.

1. Neither Party to this Agreement shall be liable or deemed to be in breach or default for any delay or failure in performance under this Agreement or interruption of Services resulting directly or indirectly from acts of God; government orders or actions; wars; civil or military disturbances; terrorism; strikes; epidemics or pandemics; fires; floods; earthquakes; tornadoes; accidents; explosions; labor disputes; loss or interruption of electrical power or other public utility; freight embargoes or delays in transportation; or any similar or dissimilar cause beyond a Party's reasonable control. A Force Majeure event does not include an act of negligence or intentional wrongdoing by a Party. A Party claiming a Force Majeure event shall use reasonable diligence to mitigate the effects of or remove the condition that prevents or delays performance. They shall also use reasonable diligence to reduce the duration of non-performance due to the Force Majeure event in order to resume full performance. Any Party suffering a Force Majeure event ("**Affected Party**") shall notify the other Party ("**Non-Affected Party**") in writing immediately or within twenty-four (24) hours as soon as reasonably possible specifying the cause of the event, the services impacted, and a good faith estimate of the duration and/or required time to restore full performance. If the Force Majeure event continues for more than thirty (30)

days from ... Notice, the Non-Affected Party shall have the ... terminate this Agreement without
penalty.

Page #: 60

## ARTICLE XII. REPRESENTATIONS AND WARRANTIES.

A. Consultant hereby represents and warrants that any and all Services will be performed in a professional manner, by qualified personnel, and that all such work shall be free of errors and defects. Errors and defects include any error, omission, or misinformation that Consultant would deliberately or unintentionally share through the Program, content, materials, and/or behavior, or fail to correct.

B. Consultant represents and warrants that all work product, intellectual property, and Services under this Agreement shall be produced from the sole efforts of Consultant and approved key personnel, and Consultant has not and will not use the work product or intellectual property of another individual, organization, agency, and/or business in the Services for Company, except when permitted to do so under an appropriate license or permission which shall only be incorporated to compliment and not substantially comprise Consultant's work product, intellectual property, and Services under this Agreement. Consultant promises they have not and will not steal or borrow work product and/or intellectual property from another or attempt to deliver and represent said work product and intellectual property as their own to the Company.

C. Submission of invoices or proof of work performed to Company is Consultant's representation and warranty that Services have been completed, as indicated on the invoice, by Consultant. Consultant further agrees that, in the event of any error, defect, or omission, Consultant shall immediately correct such error, defect, or omission or non-conformance at no additional cost to Company. This remedy is in addition to any and all other remedies which Company may have pursuant to this Agreement or otherwise available under law.

## ARTICLE XIII. LIMITED LIABILITY.

Neither Party shall be liable, for any reason, for loss of profits or business opportunities, consequential, incidental, special or indirect damages, regardless of whether the other Party has been advised of or is aware that such damages have occurred or may occur.

## ARTICLE XIV. INSURANCE.

A. When applicable, unless excused by the Company, the Consultant shall acquire and maintain during the entire period of performance of this Agreement and at Consultant's own expense, insurance of at least the following with minimum coverage amounts as set forth below:

1. Workers' Compensation and Employer's Liability Insurance in accordance with the amounts specified by the laws of the states in which the work is to be performed under this Agreement. In absence of such state laws, an amount of $1,000,000 shall be required and maintained.
2. General Liability Insurance including bodily injury liability in the minimum amount of $500,000 per incurrence or adequate Professional Errors and Omissions (Professional Liability) coverage.

B. When required, Certificates or proof of Insurance shall be furnished to Company within ten (10) days of the execution of this Agreement, and from time to time upon reasonable request. Consultant, when applicable or upon request, shall identify Company as an additional insured under the policies of insurance in Subsection A.1. and A.2. above.

## ARTICLE XV. INDEMNIFICATION.

A. Consultant, at their own expense, shall indemnify, defend and hold harmless the Company, its officers, directors, employees, agents, affiliates, and assigns from and against any claim of infringement of any patent, trademark, or copyright or misappropriation of a trade secret with respect to any software, source code, program, service and/or other materials (collectively, "**Work Product**") developed by Consultant under this Agreement. Should Work Product developed by Consultant under this Agreement become, or in Consultant's opinion be likely to become, the subject of a claim of infringement of a patent, trademark, or copyright or misappropriation of a trade secret, Consultant shall use its best efforts either to procure for Company the right to continue using the Work Product, or to replace or to modify Work Product to make it non-infringing or without misappropriation but operating with the same functionality, without additional compensation and without delay.

B. Consultant shall indemnify, defend and hold harmless Company and its officers, directors, employees, agents, affiliates, and assigns from any and all losses, damages, costs, liabilities and expenses (including reasonable attorney and legal fees), plus interest, to the extent they arise out of or in connection with any of the    following:

1. the death or bodily injury of any agent, employee, customer, business invitee, business visitor or other person, and the damage, loss, or destruction of any real or tangible personal property, either of which is caused directly by the negligence or intentional misconduct of Consultant, its employees, contractors, agents, or Consultant's guests;
2. any negligence or intentional misconduct by or on behalf of Consultant in the performance of this Agreement that causes Company to be obligated to indemnify, defend, and/or hold harmless its officers, directors, employees, agents, and assigns pursuant to   the Company Contract; and
3. any penalty and any payments demanded from, incurred by, and/or paid by Company resulting from false claims submitted by Consultant, or misrepresentation of fact or fraud by Consultant, under this Agreement.

C. Company shall notify the Consultant, in writing, of any allegations of a false claim, misrepresentation of fact, or fraud to which this indemnity applies within a reasonable time.

D. The Company shall indemnify the Consultant in the same manner and as is specified in Article XV: INDEMNIFICATION, Section B, for Company's negligence, willful misconduct, or material breach of the contract.

## ARTICLE XVI. TRADEMARK AND TRADE NAME.

This Agreement does not assign, transfer, or grant either Party any ownership rights or interest in the other   Party's trade name or trademarks.

## ARTICLE XVII. INTELLECTUAL PROPERTY.

A. All Intellectual Property and related materials, including but not limited to, moral rights, goodwill, applications for registrations or relevant registrations, and rights to any copyrights ("Intellectual Property") that is produced or developed under this Agreement is governed by the following terms, unless expressly modified in a separately executed agreement or stated otherwise in this Agreement.

B. Exclusive Rights.

1. [...] a teller that all materials created are created by Consultant under this Agreement and incorporated into the Program. Consultant immediately and automatically convey, transfers and assigns all right, title, and interest, as well as all moral rights and goodwill, in all materials, including but not limited to, content, photos/images, sound recordings, syllabus, outlines, workbooks, videos, live instructional videos, handouts, presentations, as well as the components or parts within the materials, source code, and software (collectively, the "Intellectual Property") delivered to the Company or used by the Consultant in developing the deliverables under this Agreement. The Intellectual Property shall immediately and automatically vest in and is assigned to the Company, without any separate payment or other consideration of any kind, now or in the future, and without expectation of future royalties or attribution or credit. The Consultant shall take all actions necessary to effect such vesting and assignment.

2. Consultant understands and agrees that all materials used, produced, developed, and/or delivered under this Agreement is for the sole exclusive use by the Company. Consultant is prohibited from use, display, publishing, reproducing, performing, selling, publicizing, sharing, copying, replicating, and/or creating derivative works of the Intellectual Property under this Agreement without the express written permission of Company. Consultant represents and warrants that all materials, including their components, as well as any source code or software provided to the Company shall be completely free of third-party claim of ownership. Consultant shall indemnify the Company against any and all claims of third-party ownership under this Subsection.

3. Consultant shall not file any application to own Intellectual Property or challenge the Company's application(s) in regards to Intellectual Property under this Article, in whole or in part, or for intellectual property that is included in or as a component of the Intellectual Property.

4. Nothing in this Article shall be construed to grant the Consultant a license to Intellectual Property.

5. Nothing in this Article shall be construed to grant to either Party the exclusive rights or ownership to each Party's respective business and brand names, logos, trademarks (register or unregistered), or any intellectual property, including but not limited to, copyrights owned by each Party that is not included in the Intellectual Property under this Agreement.

## C. Licenses.

1. Consultant grants a non-exclusive, irrevocable, transferrable, perpetual, worldwide, and royalty-free license to the Company to use, print, display, and publicize Consultant's name, likeness, sound, voice, and business and brand name, tagline, and slogan as well as any image, video, and recording of the Consultant (collectively, the "Image Rights") for: lawful purposes only; for the purposes of securing the absolute and complete Intellectual Property rights for all Program materials; marketing; advertising; and any lawful business purposes, along with securing copyrights. Company shall have no right to trademark or copyright (or in any other way secure the sole rights to) the Image Rights independent from Program Materials or the Intellectual Property as defined in this Agreement. Consultant waives all objections to Company's use of Image Rights that are within the scope of this license.

2. The Image Rights may be copyrighted, used and/or published individually or in conjunction with other photography, video works, and recordings, and in any medium (including without limitation, print publications, public broadcast, CD-ROM format) and for any lawful purpose, including without limitation, trade, exhibition, illustration, promotion, publicity, advertising and electronic publication by the Company, except where limited under this Article.

3. Consultant represents and warrants that (i) no other party has been granted an exclusive license for use with respect to the Image Rights, and (ii) no other party's authorization or consent is required with respect to the permission granted to the Company under this Agreement.

## D. Recordings by Third-Parties.

1. Prior to any recording by a third-party, Consultant shall obtain a written contract signed and dated by the authorized person(s) of any third-party and the Consultant that states Consultant owns the copyrights or is granted an unrestricted, transferrable, worldwide, perpetual, royalty-free, and non-exclusive right/license for commercial and non-commercial purposes of all photos, videos, and/or recordings ("Recordings") created by the

to be displayed on/in the copyrighted content/work/intellectual property of any kind. Consultant shall make every effort to ensure the proper assignment of ownership or license is obtained according to the terms of this Article and that no third-party name, logo, watermark, or any other identifier is embedded or displayed in the Recordings.

2. Upon the transfer and/or assignment of ownership of the Recordings from a third-party to Consultant, Consultant's right, title, and interest in the Recordings shall immediately and automatically vest in and is assigned to the Company, without any separate payment or other consideration of any kind, now or in the future, and without expectation of royalties, attribution, or credit. The Consultant agrees and is expressly conveys, transfers and assigns all right, title, and interest in the Recordings to Company, without additional consideration or royalties. Consultant shall take all actions necessary to effect such vesting and assignment of the Recordings in/to Company.

3. Upon the grant of a license to the Recordings from a third-party to Consultant, Consultant automatically grants an exclusive, irrevocable, transferrable, unrestricted, worldwide, perpetual, royalty-free sublicense for commercial and non-commercial purposes in the Recordings to the Company, without any separate payment or other consideration of any kind except what is provided in this Agreement, now or in the future, and without expectation of royalties, attribution, or credit. Consultant shall take all necessary actions to effect such grant of license/sublicense between Consultant and Company without delay.

4. Consultant grants Company a license to Image Rights in the Recordings according to Section C of this Article.

5. Consultant shall be solely responsible for any and all payments, royalties, and licensing fees incurred for or that are a byproduct of obtaining and maintaining such copyright assignment(s) or license(s) from a third-party.

6. Consultant shall indemnify, defend, and hold Company harmless, against any and all claims and lawsuits arising out of or in connection with the assignments and grants of licenses and sublicenses of the Recordings between a third-party and Consultant and the subsequent assignments and grants of licenses and sublicenses of the Recordings between Consultant and Company.

## E. Marketing Permission.

1. Consultant may wish to market their participation in the Program and their performance of Services. Prior to posting any marketing materials online or in print, or any other mediums of publicizing Consultant's participation in the Program or Services performed, Consultant must submit the materials as they will be used to the Company for approval. No marketing materials shall include substantial, confidential or proprietary information/contents of the Consultant's or Company's materials, presentation, or the Intellectual Property without the express written permission of the Company.

2. Company grants Consultant a non-exclusive, revocable, non-transferrable, non-assignable, worldwide, and royalty-free license to use the Company's logo as is and any testimonial, review, or feedback Company provides Consultant on Consultant's website, speaker sheet, in marketing and advertising materials, and for lawful business purposes. Consultant is prohibited from editing any testimonial, review, or feedback provided by the Company that alters the original intent and meaning of said testimonial, review, or feedback. Upon the written revocation or limitation of the license under this Article by Company, Consultant must remove all materials identified or comply with the limitations of the license within thirty (30) days of the notice of revocation or limitation.

## F. Representations and Warranties.

Consultant represents and warrants that: (i) all materials and Intellectual Property, including their components, as well as source code and software provided to Company is original and free from third-party claims of ownership and Consultant has obtained the appropriate licenses and licensing rights to use and confer such rights to Company for all non-original third-party intellectual property; (ii) Consultant has or will obtain all written and signed contracts of assignments of ownership and/or the prescribed licenses for all Recordings by third-parties; (iii) Consultant has or will obtain all written and signed contracts of assignments of ownership for all materials, work product, and intellectual

property from third parties, your control rests on an agent who has withdrawn from the agreement; (iv) no other party has been granted an exclusive license with respect to the Intellectual Property, Image Rights, and Recordings; and (v) no other party's authorization or consent is required with respect to the rights and licenses granted to the Company under this Agreement.

### G. Covenant Not to Sue.

Consultant covenants not to sue Company regarding use of Intellectual Property for lawful purposes under this Agreement and that includes administrative claims before the U.S. Copyright Office and any legal action that would circumvent the licenses and assignments granted under this Agreement to prevent, restrict, or interfere with Company's lawful use of Company's Intellectual Property, as well as registration.

### H. Survival of Termination.

The assignments and licenses of any and all intellectual property and publicity rights under this Agreement shall survive the termination of this Agreement. Nothing shall act as a limitation, termination, or revocation of the rights assigned and granted to Company. Consultant expressly agrees to waive and release all claims against Company under this Article and covenant not to sue or pursue any claim, directly or indirectly, against Company under this Article concerning the intellectual property and publicity rights.

## ARTICLE XVIII. PERSONNEL.

Consultant is hired by Company to develop educational content specifically for the Program. Consultant shall not assign their duties to a third-party company, person, or unapproved workers. Consultant agrees to have any individual that works on the Program under this Agreement and "Key Personnel" sign a contract that states the named individual: "transfer and assign to Flavors, LLC all rights, interests, and title in the intellectual property including copyrights in the work created in connection to services provided under the Independent Contractor Agreement without additional payment already received for the work performed or other consideration of any kind, and without royalties, attribution, or credit." Consultant shall be responsible for providing payment to all individuals and Key Personnel performing all or part of the Services under this Agreement from Company's payment for Consultant's Services as consideration for the assignment of intellectual property rights to Company. Consultant shall take all necessary actions to effectuate such assignment and vesting of rights under this Article in Company.

Due to intellectual property concerns, the Consultant agrees not to divert any "Key Personnel" from performance without the prior   written consent of Company. In the event it becomes necessary to remove such personnel for reasons beyond the control of Consultant, Consultant shall deliver to Company, no later than fourteen (14) calendar days, advance written notice, which notice shall designate the name and qualifications of the proposed replacement, whose qualifications and capabilities shall be at least equal to those of the person being replaced, and a copy of the intellectual property assignment contract the released personnel signed with a list of all work they created. The Company reserves the right to approve or deny the replacement prior to performance of any services.

Consultant shall provide Company with a copy of all intellectual property assignment contracts signed by Consultant and applicable personnel under this Article upon delivery of said intellectual property.

## ARTICLE XIX. FEDERAL REGULATIONS AND OTHER APPLICABLE TERMS AND CONDITIONS.

A. Company must adhere to the Uniform Guidance, 2 C.F.R. Part 200, as well other terms and conditions under the Company Contract. As a Consultant for Company, you agree to adhere to the applicable regulations in the Uniform

and be in full force and effect for the duration of this Agreement.

B. When applicable, Consultant shall be responsible for ensuring compliance by its employees, contractors, and agents with Section A of this Article.

# ARTICLE XX. GENERAL PROVISIONS.

A. Authorized Agent: The Parties represent and warrant that they are of legal age, of sound mind, and are the authorized agent with the legal authority and permission to enter this Agreement on behalf of the above stated Parties as of the date of the execution of this Agreement.

B. Notice: All notices shall be in writing and deemed to be given or made when delivered  by hand to an authorized agent; by express mail provided it has the ability to track delivery; registered or certified mail; or within three (3) days of being sent by email and received by the mail server of the recipient absent any delivery error notice. Notice shall be sent as follows:

| Company | Consultant |
|---|---|
| **Flavors, LLC (dba Flavors)** | **Homegrown By Chef Janelle** |
| **Attn: Samia Bingham, Founder & CEO** | **Attn: Janelle Pitterson** |
| **Address: 6504 American Blvd. #105A** | **Address: 30 Wall Street, 8th Floor** |
| **Hyattsville, Maryland 20782** | **New York, NY 10005** |
| **Email: samia@whatsyourflavor.co** | |
| | **Email:janelle@homegrownbyjanelle.com** |

C. Headings: The headings set forth in this Agreement are for the convenience of the Parties, and in no way define, limit, or describe the scope or intent of this Agreement and shall be given no legal affect.

D. Days: All reference to days in this Agreement shall mean calendar days, unless otherwise specified.

E. Schedules and Exhibits: Any and all Schedules and Exhibits attached or referenced in this Agreement are incorporated into and considered to be part of this Agreement.

F. Amendments and Modifications: Except with respect to Articles IV: TERM, Article IX: STOP WORK ORDER, and Article XI: DELAY, this Agreement cannot be modified, changed or amended, except in writing signed by a duly authorized representative of each of the Parties.

G. Assignment and Delegation: Neither Party shall assign or delegate any of its rights, duties, or obligations under this Agreement to any other person and/or entity without prior express written approval of the other Party. Any attempt at such an assignment or delegation without prior written approval of Company shall be null and void for all purposes. This Agreement shall inure to the benefit of and be binding upon the successors, heirs, legal representatives, and assignees of the Parties.

H. Conflict: In the event of any conflict or inconsistency between the terms of this Agreement, the incorporated terms of the Company Contract shall govern. In the event of any conflict or inconsistency between the terms of the body of this Agreement and any Schedule or Exhibit of this Agreement, this Agreement shall govern.

I. Waiver: No waiver shall be deemed to have been made by either Party unless expressed in writing and signed by the waiving Party. The failure of either Party to insist on any one or more instances upon strict performance of any of the terms or provisions of this Agreement, or to exercise any  option or election contained herein, shall not be construed as a waiver or relinquishment of the right to enforce such terms, provisions, or election, but the same shall continue and remain in full force and effect, and no waiver by any Party of any one or more of its rights or remedies under this Agreement shall be deemed to be a waiver of any prior or subsequent rights or remedy provided here or at law, unless otherwise stated in this Agreement. All remedies afforded in this Agreement shall be taken and

construed as cumulative. In addition to every other remedy available at law or in equity, this ... shall govern, except where waiver provisions have been established elsewhere in this Agreement.

J. Dispute Resolution: Any dispute between the Parties and not based upon   Company action or inaction under the Company Contract shall be resolved as follows:

1. The Parties will attempt in good faith to resolve any controversy or claim(s)   arising out of or relating to this Agreement through discussions between the authorized representatives or designees of the Parties. If the discussions are unsuccessful, the Parties agree that any action asserting a claim by one Party against the other must be brought in the state or federal court with appropriate jurisdiction in Prince George's County, Maryland, unless jurisdiction is prescribed elsewhere in this Agreement or dictated by Company Contract or federal law.
2. If any legal action is pending on any claims between the Parties, any claim which could be brought as a counterclaim must be brought in the pending action, if at all.
3. The Parties agree to waive any right to a jury trial that either Party might otherwise have in any and all courts.
4. The Parties acknowledge that the breach of any provision or article of this Agreement relating to confidentiality or rights to intellectual property by one Party will give rise to irreparable injury to the other Party which is not adequately compensable in damages or at law. Accordingly, the Parties agree that injunctive relief will be an appropriate remedy to prevent violation of either Party's respective rights and/or obligations under those provisions, provided that nothing in this general prohibition shall limit a Party's right to any other remedies in equity or at law, including the recovery of damages and legal and attorney fees.
5. Any dispute that Consultant has based upon Company action or inaction under the Company Contract shall be resolved as follows:

- Consultant shall submit such claim to Company. In the event that Consultant's claim has a value of $100,000 or more, Consultant shall submit with such claim a certification in the form and manner required under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*;
- Company may sponsor such claim with Consultant's bearing the sole cost and expense, or shall timely notify Consultant, in writing, that it chooses not to sponsor such claim, in which event, the dispute shall be resolved in accordance with Section J.1., above. However, if Company sponsors such claim and suffers any loss or damages whatsoever, Consultant shall, without further proceedings or adjudication, reimburse Company for any and all losses, damages, costs and fees, notwithstanding any payment provision to the contrary;
- If the claim is sponsored by the Company and a final decision is issued    by Company under the "Disputes" clause of the Company Contract, and the decision relates to or affects the Agreement, then Company shall transmit a copy of that decision to Consultant within ten (10) days after its receipt by Company. Consultant shall notify Company as to whether Consultant would like Company to sponsor an appeal of the decision to an appropriate agency board of contract appeals or the United States Court of Federal Claims. In no event shall such decision be transmitted to Company more than five (5) days after Consultant's receipt of the decision. Any such appeal will be at Consultant's sole cost and expense;
- If any administrative or judicial appeal or lawsuit is taken at Consultant's request, which relates to or affects this Agreement, Consultant shall have the right to participate in the prosecution of the appeal or lawsuit, including the preparation of pleadings, introduction of evidence and presentation of arguments. In any administrative or judicial appeal or lawsuit taken or brought by Consultant, upon Company's election not to do so, Company shall, in good faith and in every reasonable manner, assist Consultant. Consultant will bear all costs and expenses incurred in prosecuting any appeal or lawsuit taken or brought solely at Consultant's request; and
- If a decision by an Officer of the Grant Provider (federal government), board of contract appeals, or court relating to the Company Contract becomes binding on Company by reason of the exhaustion of all administrative remedies or by reason of the failure to timely seek judicial relief or review in accordance with these provisions, and such decision relates to or affects this Agreement, then such decision shall also be binding, final, and conclusive on Company and Consultant under this Agreement.

6. The rights and obligations in Section I shall survive the termination of this Agreement.

J. Survival: The following mentioned terms, incorporated between these terms and conditions, shall survive the termination of this
J. Survival: The following mentioned terms, incorporated between these terms and conditions, shall survive the termination of this Agreement: Articles VI: CONFIDENTIAL INFORMATION; XI: TERMINATION; XII: REPRESENTATIONS AND WARRANTIES; XIII: LIMITATION OF LIABILITY; XV: INDEMNIFICATION; XVI: TRADEMARK AND TRADENAME; XVII: INTELLECTUAL PROPERTY; XIX: FEDERAL REGULATIONS AND OTHER APPLICABLE TERMS AND CONDITIONS; and XX: GENERAL PROVISIONS.

K. Communications and Contracting with the Company: The Company shall be responsible for communications with the Consultant relating to the Company Contract and this Agreement. The Consultant may communicate directly with the Company for Technical Direction only and shall coordinate the same with the Company's Program/Project Manager. The Consultant shall not discuss other aspects of this Agreement unless authorized in writing by the Company. Consultant shall not assign any portion of their rights, duties, or obligations under this Agreement to a third-party nor shall Consultant, directly or indirectly, contract with a third-party company other than Company to perform Services under this Agreement.

L. Laws: Consultant shall comply with all applicable federal, state, county, local, and provincial laws, ordinances, regulations, and codes in the performance of Services, including the procurement of any necessary permits and licenses.

M. Governing Law: This Agreement shall be construed, interpreted, and governed by the Federal common law of contracts, as enunciated and applied by Federal judicial bodies,    boards of contract appeals, and quasi-judicial agencies of the Federal government. To the extent the Federal common law of contracts is not dispositive, the laws of the State of Maryland shall govern, without respect to conflict of law principles.

N. Severability: If any provision of this Agreement is found to be void, invalid, or otherwise unenforceable, in whole or part, the remaining provisions of this Agreement shall remain in full effect without the void, invalid, or unenforceable provision.

O. Non-Solicitation: During the term of this Agreement and for one (1) year after the conclusion of this Agreement, neither party shall solicit or hire any current or former employees of the other party who have been directly involved in the activities and work covered by this Agreement during the previous twelve (12) months, without the written approval of the other Party. This shall not apply to situations where the employee applies for a position from a public announcement with the Company or Consultant.

P. Entire  Agreement: This Agreement, together with all Exhibits and Schedules incorporated by reference, constitutes the entire and sole agreement between the Parties with respect to the subject matter and supersedes any prior agreements, negotiations, understandings, or other matters, whether oral or written, with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, the Parties, by their duly authorized agents, have read and agree to the terms of this Agreement and have had the opportunity to seek legal counsel, regardless of whether legal counsel was sought, with the expressed intent that this Agreement shall become effective upon the date of the last affixed signature ("**Effective Date**") below.

Founder & CEO Flavors, LLC.

Samia                                          Bingham

**Signature**

*Samia Bingham*

Digitally signed by Samia Bingham

**Date and time:** 5/7/2024, 7:30:28 PM EDT

**IP address:** 173.73.249.239

Owner Homegrown By Chef Janelle

I agree to the terms and conditions of this contract.

Janelle                                         Pitterson

**Signature**

*Janelle Pitterson*

Digitally signed by Janelle Pitterson

**IP address:** 69.114.42.72

EIN or SSN if an individual*

87-2655367

# SCHEDULES & EXHIBITS

**SCHEDULES & EXHIBITS**

**LIST OF SCHEDULES**

| Schedule | Description | Number of Pages |
|----------|-------------|-----------------|
| A | Description of Services and Other Consulting Requirements | 2 |
| B | Payment Instructions and Schedule for Services | 1 |
| C | Security Policy | 1 |
| D | Grant Regulations & Policies | 1 |
| E | Invoice Template | 2 |
| F | Reporting Template | 2 |
| G | Additional Terms | TBD |

**LIST OF EXHIBITS**

| Exhibit | Description | Number of Pages |
|---------|-------------|-----------------|
| A | Quality Control Plan | 1 |

# Schedule A

**SCHEDULE A**

**[SEE ATTACHED PROPOSAL, <u>DATED 08 MAY 2024</u>, SUBMITTED IN RESPONSE TO RFP]**

JP _____ *

# Schedule B

# Payment Instructions and Payment for Serv

Consultant shall submit an invoice to Company on a monthly basis. Monthly report must accompany each invoice to be cons
unless it is approved by the Company and has all of the required information.

1. Enter invoice into Bill.com
2. See Invoicing terms in Article VI(B)
3. Invoices subject to the approval of the Company.
4. Submit invoices via BILL.COM.   Invoices will be reviewed and approved from Bill.com.
5. Invoices should detail services performed, deliverables delivered, and work in progress in accordance with Schedule

**INVOICE REQUIREMENTS:**

1. Service Provider's Name
2. Company Name
3. Address
4. Point of Contact Name
5. Email
6. Phone Number
7. Reference to your specific Contract Number **"Flavors-23-035"  and "Culinary Advisor & Instructor"**
8. Total Fee
9. Invoice details which shall reflect a description of Services performed (tasks completed) and/or monthly activity along

**PAYMENT INSTRUCTIONS:**

- Submit invoice to Company for payment.

**All Payments will be made Net30 upon the receipt of the monthly report and invoice by consultant and approval by the Agreement.**

# Payment for Services

Service Provider shall detail the required payment terms for Company to follow

Consultant shall be paid according to the following payment terms:

**Total Payment for Cohort I: $8,500.00**

| Services Delivered For Cohort II | PRICE | |
|---|---|---|
| Host Nine (9), One (1-Hour) Interview Sessions with Program Instructors . Develop questions relative to building a professional food and beverage business brand. | $ | |
| One (1) In-Person 1-hour Course Opening Speech with Details Regarding Field Trip for Cohort II at Flavors in Hyattsville. Continental Breakfast and Lunch Provided | $ | |
| Five (5), One (1) Hour Virtual Office Hours- Live StreamYard Q&A with participants for Cohort II | $ | |
| NYC Food Hall Tour & Instruction for Cohort II | $ | |
| Graduation Planning & Host + 30-minute Closing Keynote Speech | $ | |
| Cohort II Final Reporting and Close-out Meeting with Flavors Team | $ | |
| Written Feedback on student participants coursework within 14 days of submission (via email or video recording) | $ | |
| | | |
| **SubTotal: Cohort II:** | **$8,500.00** | |
| | | |
| Host Nine (9), One (1-Hour) Interview Sessions with Program Instructors | $ | **TBD** |
| One (1) In-Person 1-hour Course Opening Speech with Details Regarding Field Trip for Cohort II at Flavors in Hyattsville. Continental Breakfast and Lunch Provided | $ | **TBD** |

| | | |
|---|---|---|
| Five (5) One-Hour Virtual Meets Live Stream and Q&A with professor for Cohort II: TBD | $ | TBD |
| Co-Packing Facility Tour & Instruction for Cohort II: TBD | $ | TBD |
| Graduation Planning & Host + 30-minute Closing Keynote Speech | $ | TBD |
| Cohort II Final Reporting and Close-out Meeting with Flavors Team | $ | TBD |
| Written Feedback on student participants coursework within 14 days of submission (via email or video recording) | $ | TBD |
| | | |
| | | |
| **SubTotal: Cohort III** | $ | **TBD** |
| | | |

## Payment Terms (please include the deposit amount and remaining payment schedule):

The following payment schedule will apply for the contract term from May 18, 2024, to June 19, 2024, covering the deliver
includes preparation for the program kickoff in week one, conducting and preparing for multiple virtual Q&A sessions, an
involve significant study, preparation, and direct engagement with students. Each session is expected to last approximate

Deliverables:
- In-Person Engagement:Active participation at the Flavors Networking events in Washington, D.C., and at graduation even
-Presentations: conducting special presentation in New York.
- Virtual Sessions: Conducting and preparing for virtual Q&A sessions and other virtual engagements with students.

1. Deposit: A deposit of 50% is required to secure the services outlined in this contract. This deposit must be received by
preparation time for the kickoff and subsequent sessions.

2. Final Payment:The remainder of the balance is due by June 19, 2024. This final installment will cover the continuation a
services through the end of the contract period.

Please ensure that payments are made according to the schedule above to facilitate a smooth execution of all planned ac

JP _____ *

---

# Schedule C

## SCHEDULE C

### Security Policy

Security Policy is being developed by Flavors E-Learning Platform Development Team. The Security Policy will be provided for review and signature before access to the E-Learning Platform is provided to the Consultant during the execution of duties under this Agreement.

JP _____ *

Schedule D

**SCHEDULE D**
Grant Regulations & Policies

**NOTE:** Flavors is a Federal Government Contractor; therefore, the below regulations and policies are listed below in accordance with the mandates of our end-users. Services and/or products procured through consultants will effectively be used to provide the required services required by the government customers we service. The policies listed below are added for compliance purposes with our government end-user.

**LFPP Resource Page**

**Code Of Federal Regulation 2 CFR 200**

**Federal Audit Clearinghouse**

**USDA General Terms & Conditions**

JP _____  *

Schedule E

**SCHEDULE E**
**Invoicing Template**

|  | CONTRACTOR INVOICE | |
|---|---|---|
| **From:** Vendor Name Address | | **INVOICE**#: 001 **DATE**: 03/06/2023 |
| **TO** Flavors 6504 American Boulevard, Suite105A Hyattsville, MD 20782 Phone: 301-806-9869 | | **FOR** Local Food Promotion Program |
| **Description** | | **Amount** |
| # of Hours Billed (Hourly Rate) or Monthly Retainer for Services – Period of Performance Ex: 60 Hours of Administrative Support at $x/hour/Monthly Program Administrative Support Services ($xx/hr) – October - February Provide at least 3 bullet points describing activities completed during invoice period | | $0 |
| | | |

| Description | | Amount |
|---|---|---|
| Total | | Total  =$0 |

Make all checks payable to Company Name

Payment is due within 21 days.

If you have any questions concerning this invoice, contact vendor name and email address.

**Thank you for your business!**

JP _____ *

# Schedule F

**SCHEDULE F**

**Reporting Template**

**Reporting Template**

| Contractor Name: | | Date: |
|---|---|---|
| Services Description | | |
| Total Hours Worked | | |
| Program Reporting Period: | | |

1. Please describe your outcomes, goals, or objectives achieved during this reporting period.
2. How do these activities contribute to the success of the Flavors Technical Incubator.
3. Share a success story that illustrates the impact your activities have made on the program during this reporting period.
4. Have there been any challenges, lessons learned, or obstacles that have prevented you from achieving your desired outcomes/results this reporting period? If so, what have you/will you do to overcome those barriers?
5. Share any other relevant information, news, events, awards, or activities you wish to highlight with respect to the services provided during this reporting period.

Approved:

_____

Name

_____

Signature

_____

Email Address

Telephone Number

JP _____    *

# Schedule G

**SCHEDULE G**

**Additional Terms**

RESERVED

JP _____    *

# Exhibit A

**EXHIBIT A**

**Quality Control Plan**

| | |
|---|---|
| **Performance** | High quality performance of services<br>Timely performance<br>Adherence to contract terms, deliverables, schedules, policies, and regulations |
| **Deliverables** | High quality submittal of written deliverables<br>Timely submission of deliverables<br>Adherence to contract terms, deliverables, schedules, policies, and regulations |
| **Communication** | Adherence to Company communication policy<br>Monthly Program Management Report adherence to quality, timeliness, and attention to detail |
| **Key Personnel** | Personnel challenges<br>Technical knowledge, skills, and ability<br>Communication with Flavors leadership<br>Adherence to contract terms and conditions |
| **Reporting** | High quality submittal of written reports<br>Timely submission of reports<br>Adherence to contract terms, deliverables, schedules, policies, and regulations |
| **Security** | Adherence to Flavors policies and procedures<br>Organizational conflict of interest |

I agree to the terms and conditions of this contract.

Janelle                          Pitterson

**Signature**

*Janelle Pitterson*

Digitally signed by Janelle Pitterson

**Date and time:** 5/7/2024, 7:20:24 PM EDT

**IP address:** 69.114.42.72